IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JEFF BURGESS, et al., | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-18-0744 |
| CSX TRANSPORTATION, INC., | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

Defendant CSX Transportation Inc. ("CSX") is a freight railroad company that employs approximately 23,000 people. (ECF No. 179-19 ¶ 1.) Plaintiffs Don Biemer, Jeff Burgess, and Jeffrey Whisner worked for CSX as train and engine ("T&E") employees. (ECF No. 179-29 ¶ 2.) In 2018, Plaintiffs—along with 78 other CSX employees—were either suspended or terminated after they used Family and Medical Leave Act ("FMLA") leave time over the holidays in December 2017 and January 2018. (See ECF No. 179-19 ¶ 4.) CSX contends that it disciplined Plaintiffs based on its honest belief that Plaintiffs misused their FMLA leave solely to avoid working on holidays. Plaintiffs respond that they merely used the FMLA leave that CSX had previously approved and that, by disciplining them, CSX interfered with their rights under the FMLA and retaliated against them for taking approved FMLA leave. Now pending before the Court is CSX's Motion for Summary Judgment on both claims. (ECF No. 179.) For the reasons

that follow, the Court will grant summary judgment on the interference claim and deny summary judgment on the retaliation claim.[1]

## I. BACKGROUND

### A. Factual Background

#### 1. CSX's Staffing Procedures

As one of the nation's largest railroads, CSX operates 24 hours per day and 365 days per year. (ECF Nos. 145 ¶ 1; 150 ¶ 1.) As such, its T&E employees—the employees "out there to run the trains" (ECF No. 179-39 at 13)[2]—"do not work a set schedule and instead are called to work on an as-needed basis" (ECF No. 179-32 ¶ 6). Thus, employees must always be "marked up," meaning they are available to work, unless they have an approved reason to be "marked off," meaning they are unavailable to work. (Id.) Approved reasons to be marked off include vacation, personal leave, and FMLA leave. (Id. ¶ 6; ECF No. 179-29 ¶ 8.) Employees cannot use their vacation or personal leave whenever they want to, however. Rather, they must bid for days off, and leave is approved based on seniority. (E.g., ECF No. 179-3 at 5.) Conversely, employees can use their FMLA leave as needed, without bidding and without regard to whether other employees are already marked off. (See, e.g., ECF No. 179-7 at 11.)

Employees may take FMLA leave for their own health conditions or to help care for family members with medical ailments. 29 U.S.C. § 2612(a)(1). To obtain approval for FMLA leave, employees at CSX are required to fill out a medical certification form. (ECF No. 179-39 at 10.) This form requires employees to respond "as specific[ally] as [they] can" to a series of questions

---

[1] Also pending is CSX's Motion to Exclude Opinions and Testimony of Plaintiff's Expert Beth De Lima. (ECF No. 180.) The Court will deny this Motion without prejudice to reconsideration as a motion *in limine* or as an objection made during trial.

[2] All page numbers cited in this Memorandum refer to the pagination listed on the Court's Electronic Case Files ("ECF") system, not to any internal page numbers listed on the documents.

about the employees'—or their family members'—medical history. (*E.g.*, ECF No. 179-4 at 1.) This includes the nature of the underlying medical condition which necessitates the leave, the medications used to treat the condition, and the amount of leave the employee is requesting. (*Id.*) A health care provider must also sign the form to certify that it is accurate. (*Id.* at 2.) A third-party vendor then reviews the form and determines if the employee qualifies for FMLA leave. (ECF No. 179-39 at 10.) In close cases, CSX's FMLA administrator decides if FMLA leave should be approved. (*Id.*)

### 2. CSX's Monitoring of FMLA Use

CSX's Individual Development and Personal Accountability Policy ("IDPAP") prohibits dishonesty. (ECF No. 179-43 at 2.) And using FMLA leave solely to avoid working on or around holidays, weekends, vacation, and rest days constitutes dishonesty in violation of the IDPAP. (ECF No. 179-44 at 11.)

In 2016, CSX's manager overseeing FMLA benefits, Jolanda Johnson, led the development of an automated system that was meant to ferret out FMLA misuse. (ECF No. 179-39 at 14.) Each week, this system looked back at every employee's FMLA usage over the preceding 12 weeks. (*Id.* at 16.) If an employee had five suspicious uses of FMLA leave within 12 weeks, the algorithm flagged that employee to Johnson. (*Id.* at 18–19, 26.) A suspicious use was any FMLA use on a weekend—which CSX considered to be Fridays, Saturdays, and Sundays—and any FMLA use that was taken immediately before or after a day off. (*Id.* at 18–19.) If Johnson believed that an employee's actions amounted to FMLA "pattern use," she would conduct an individualized review. (*Id.* at 22.) This involved "review[ing] the medical information, review[ing] the absences that have been identified as pattern use and the statuses of those absences." (*Id.*) In certain cases,

3

employees' social media was reviewed, and employees were sometimes even surveilled by private investigators. (*Id.*)

Each time Johnson suspected an employee of FMLA pattern use, the employee would receive a warning letter or reprimand. (*Id.* at 27.) After four instances of suspected pattern use, the employee would ordinarily be dismissed. (*Id.*)

### 3. CSX's Investigation of Alleged FMLA Misuse During the 2017/2018 Winter Holidays

During Christmas 2017 and New Year's 2018, Johnson noticed that a sizable percentage of T&E employees had marked off for FMLA leave. (ECF No. 179-19 ¶ 2.) For instance, she found that 800 employees—about 10% of the T&E workforce—were marked off for FMLA leave on December 25, 2017, while less than 200 employees were marked off for FMLA leave one week earlier, on December 18, 2017. (*Id.*) Based on this, Johnson suspected that some employees may have been using FMLA leave to avoid working over the holidays, in violation of the IDPAP's prohibition against dishonesty. (*Id.* ¶ 3.)

To investigate this FMLA usage, Johnson used a modified version of the automated system for FMLA tracking already in existence. The modified algorithm flagged any employee who had used FMLA leave on four of the ten most recent holidays and other special occasions (such as Black Friday and Christmas Eve). (*Id.*) Johnson reviewed this list of employees and removed from the list any who had cancer, a terminal illness, or were about to give birth because, in Johnson's view, these conditions "clearly explained the mark-offs." (ECF Nos. 179-19 ¶ 3; 179-39 at 37.) Notably, Johnson possessed no medical training. (ECF No. 179-39 at 38.)

Johnson gives conflicting accounts of what she did next. In a declaration filed with the Court, she states that all remaining employees were charged with dishonesty and removed from

4

service pending a hearing. (ECF No. 179-19 ¶ 3.) But in her first deposition, she states that she conducted an individualized review of each employee's case before charging them with dishonesty. (ECF No. 179-39 at 36.) She testified that she completed this review by considering each employee's stated medical reason for FMLA leave and determining, despite her lack of any medical training, whether that reason justified the usage of FMLA leave on the holidays that the employee had marked off. (*Id.* at 38.) In her deposition, she could not recall speaking to any employees or their medical providers as part of the individualized review. (*Id.* at 30.)

After each employee was charged with dishonesty and removed from service, he received a hearing. (ECF No. 179-19 ¶ 3.) These hearings each followed similar procedures. A CSX manager, known as the "hearing officer," both conducted the hearing and questioned the witnesses. (ECF No. 179-33 ¶ 3.) Ordinarily, the only witness for CSX was the "charging officer." (*See id.*) This was a CSX employee, often Jolanda Johnson, who explained the charges against the employee and admitted various documents as exhibits. (ECF No. 179-19 ¶ 11.) Before each hearing, the charging officer provided the hearing officer with "talking points . . . basically questions" to review at the hearing. (ECF No. 186-2 at 17.) The charged employees could also present evidence. (ECF No. 179-33 ¶ 4.) But they were only permitted assistance from a union representative, not legal counsel. (ECF No. 182 at 14.) The hearings did not have any formal rules of evidence. (*Id.* at 14–15.)

After the hearing, the hearing officer issued a finding as to whether the charge had been proven and sometimes recommended discipline. (*Id.* at 18; ECF No. 179-55.) An employee from CSX's Labor Relations department then reviewed this information and made her own recommendation regarding discipline to the regional superintendent or his designee. (ECF No. 179-40 at 4, 15.) The superintendent or his designee then accepted the recommendation from

Labor Relations without personally examining the record, even if Labor Relations' recommendation differed from the hearing officer's. (ECF No. 179-42 at 15; *see* ECF Nos. 179-12; 179-51.) If an employee received discipline, he could eventually appeal it to an arbitrator. (ECF No. 179-29 ¶ 17.)

### 4. The Plaintiffs

With this background established, the Court reaches the three Plaintiffs in this matter, each of whom was a CSX T&E employee who was approved for FMLA leave but was flagged and disciplined for FMLA misuse.

#### a. Biemer

Biemer began working for CSX in 1994. (ECF No. 179-3 at 4.) Over the course of his career at CSX, he worked in numerous roles including as a brakeman, conductor, and engineer. (*Id.*) In 2017, he lived in Nottingham, Maryland and worked out of a CSX facility in Baltimore. (*Id.* at 3–4.) Biemer was approved to take FMLA leave to take care of his father, who had several health issues including tremors, syncope, anxiety, and dementia. (*Id.* at 7.) Biemer's father lived in Delaware, and due to his dementia, did not drive. (*Id.*) Thus, Biemer was required to drive him to doctor appointments and to take "general care" of him. (*Id.*) Biemer was approved by CSX to take up to three days of FMLA leave per month to care for his father. (ECF No. 179-45 at 5.) He was also approved to take his father to two doctor appointments each year. (*Id.*)

On Thanksgiving Day in 2017, Biemer marked off for FMLA leave. (*Id.* at 15.) Because his siblings were unable to transport his father, Biemer drove to Delaware to pick up his father and then returned with him to Maryland. (ECF No. 179-3 at 11–12.) After the Biemer family spent Thanksgiving together, Biemer drove his father back to Delaware the next day, which was Black

6

Friday. (*Id.*)  When Biemer returned home to Maryland, he marked back up.  (ECF No. 179-45 at 15.)

A similar situation occurred over the Christmas holidays.  On the morning of December 24, 2017, Biemer marked off using FMLA leave.  (*Id.*)  He drove to Delaware to pick up his father and returned with his father back to Maryland so that the family could celebrate Christmas together.  (ECF No. 179-3 at 11.)  The next day, which was Christmas Day, Biemer drove his father back to Delaware.  (*Id.*)  Biemer marked back up as available to work at 10:40 PM.  (ECF No. 179-45 at 15.)

Because Biemer marked off for FMLA leave on four holidays, he was charged with dishonesty and removed from service.  (ECF No. 179-19 ¶ 5.)  At his hearing, the charging officer pointed to two pieces of evidence against Biemer: the general spike in FMLA use and an "individualized review done on Mr. Biemer's FMLA usage over the recent holidays."  (ECF No. 179-44 at 7.)  This individualized review, however, seemed to simply be the fact that Biemer used his FMLA leave on these holidays.  There is no evidence that CSX questioned Biemer about his specific reasons for using his FMLA leave on these holidays, nor is there evidence of any further investigation into any non-holidays on which Biemer may have used his FMLA leave.  Biemer also had never been flagged for FMLA misuse previously.  (ECF No. 179-47.)  Even so, the hearing officer found that Biemer had committed dishonesty.  (ECF No. 179-46.)  Labor Relations agreed and recommended a time-served suspension, which was ultimately imposed.  (ECF Nos. 179-6; 179-47.)  Biemer then went on a medical leave of absence.  (ECF No. 179-3 at 17.)  It is not clear from the record what his current status at CSX is, if any.

7

### b. Burgess

Burgess began working for CSX in 2007. (ECF No. 179-7 at 4.) Over the course of his career at CSX, he worked as a conductor and an engineer. (*Id.*) In 2017, he lived and worked in Cumberland, Maryland. (*Id.* at 3, 5.) Burgess was approved to take FMLA leave for his irritable bowel syndrome ("IBS"). (*Id.* at 7.) Burgess explained that the primary triggers for his IBS were diet and stress. (*Id.* at 8.) Burgess was particularly hesitant to mark up as available for work when he was suffering a flare-up because he felt that his symptoms rendered him unable to safely perform his job. (*Id.*) Burgess' doctor estimated that Burgess required FMLA leave for up to two days per month. (ECF No. 179-8.) CSX approved Burgess for this amount of leave in addition to two doctor visits each year. (*Id.*; ECF No. 179-49 at 9.)

Burgess used part of his approved FMLA leave on five holidays between June 15, 2017 and December 27, 2017: Father's Day, Thanksgiving, Black Friday, Christmas Eve, and Christmas Day. (ECF No. 179-11.) Thus, he was flagged by CSX's algorithm, charged with dishonesty, and suspended from service. At his hearing, the charging officer again pointed to the general spike in FMLA use as well as an "individualized review" of Burgess' FMLA usage as the evidence against him. (ECF No. 179-48 at 25.) Burgess had also been warned once previously, in June 2017, about potential FMLA misuse. (*Id.*) Burgess testified at his hearing that he did not use FMLA leave to avoid work but was instead upset that he was not receiving enough work. (*Id.* at 34.) The hearing officer found that the charge of dishonesty against Burgess was not proven. (ECF No. 179-50.) However, without providing a rationale, Labor Relations overruled this decision and determined that the charge was proven. (ECF No. 179-51.) Burgess was terminated, and his dismissal was upheld by an arbitrator. (ECF Nos. 179-12; 179-35 at 64–68.)

8

### c.  Whisner

Whisner began working for CSX in 2010.  (ECF No. 179-13 at 4.)  Over the course of his career at CSX, he worked as a conductor and an engineer.  (*Id.*)  In 2017, Whisner lived in Rawlings, Maryland and worked in nearby Cumberland.  (*Id.* at 3–5.)  He was approved to take FMLA leave to care for his mother who suffered from a variety of health conditions, including a quintuple bypass, severe diabetes, and multiple broken bones.  (*Id.* at 5.)  Whisner's mother lived with him, so he served as his mother's primary caregiver, although Whisner's girlfriend was also sometimes able to help.  (*Id.* at 5–6.)  Whisner's mother's doctor estimated that Whisner would need to assist his mother for 48 hours per week.  (ECF No. 179-14 at 3.)  CSX approved Whisner for 12 weeks of FMLA leave per year.  (ECF No. 179-53 at 8.)

Whisner used his approved FMLA leave on six holidays between June 15 and December 27, 2017: Columbus Day, Veterans Day, Thanksgiving, Black Friday, Christmas Eve, and Christmas Day.  (*Id.* at 11.)  Thus, he was flagged by CSX's algorithm, charged with dishonesty, and suspended from service.  Once again, the evidence at his hearing consisted of data showing the general spike in holiday FMLA usage and the fact that Whisner marked off for FMLA leave on these six holidays.  (ECF No. 179-52 at 6–7.)  Further, like Burgess, Whisner had also been warned once previously about potential FMLA misuse.  (*Id.* at 7.)  Whisner testified that he marked off whenever he needed to care for his mother, including on non-holidays.  (*Id.* at 15–18.)  The hearing officer initially found the charge of dishonesty not proven but, after further consideration, amended his conclusion and concluded that the charge was proven.  (ECF No. 179-55.)  He recommended dismissal, Labor Relations agreed, and CSX dismissed Whisner.  (*Id.*; ECF No. 179-18.)  An arbitrator later upheld this dismissal.  (ECF No. 179-35 at 340–44.)

9

\*      \*      \*

Before proceeding further, the Court pauses to highlight a critical gap in the record that applies to all three of the Plaintiffs. The Court has found no evidence in the record recounting Plaintiffs' *total* FMLA use, meaning their FMLA use on both holidays and non-holidays alike. That is, CSX has produced charts listing the specific holidays on which each Plaintiff used his FMLA leave, but CSX has failed to provide evidence showing the non-holidays on which each Plaintiff used his FMLA leave. And CSX has not argued that this is because Plaintiffs used their FMLA leave exclusively on holidays. On the contrary, the scant evidence that does exist on the subject suggests that Plaintiffs used at least some FMLA leave on non-holidays. For instance, in Burgess' case, a document that was admitted into evidence at his hearing, dated November 27, 2017, states that he used 4.63 weeks of FMLA leave, seemingly over the course of the preceding year. (ECF No. 179-49 at 9.) This document also states that Burgess used a small amount of FMLA leave on November 4, 5, 8, and 9 of 2017. (*Id.*) Because there are not enough holidays in a year to account for 4.63 weeks of leave and because none of these four days in November were holidays, it is evident that Burgess used a considerable amount of FMLA leave on non-holidays. But the only other specific days on which CSX has identified Burgess as taking FMLA leave are holidays (ECF No. 179-11), despite the fact that he clearly took FMLA leave on many non-holidays as well. The same gap in the record exists as to Biemer and Whisner. (*Compare* ECF No. 179-45 at 5, *and* ECF No. 179-53 at 8 (stating the total weeks of FMLA leave taken), *with* ECF No. 179-45 at 15, *and* ECF No. 179-53 at 11 (specifically identifying only holidays, rather than all days, when FMLA leave was taken).) Finally, and just as critically, this gap in the record also seems to have existed at Plaintiffs' disciplinary hearings. The documents the Court has cited were admitted as evidence at the disciplinary hearings and the transcripts show that no other

10

documents were admitted. (*See* ECF Nos. 179-44, 48, 52.) With this gap in the record identified, the Court proceeds onward.

### B. Procedural History

The procedural history of this case is lengthy. In March 2018, 20 CSX employees, including Burgess and Whisner, filed suit in this Court. (ECF No. 1.) They alleged that CSX unlawfully inflated the amount of FMLA leave time taken by employees, that CSX's attendance policy punished employees for taking FMLA leave, and that the holiday-season disciplinary actions violated the FMLA. (*Id.*) The Court stayed the claims relating to the holiday-season allegations pending arbitration hearings that were mandated by the applicable collective bargaining agreement. (ECF No. 40.) The Court then granted summary judgment to CSX on the claims related to FMLA leave time inflation and to the attendance policy. (ECF Nos. 50, 51.)

The arbitration hearings relating to the holiday-season claims concluded in August 2023 and the Court directed CSX to file an appropriate dispositive motion. (ECF Nos. 89, 90.) CSX moved for summary judgment, asserting that the holiday-season claims were preempted by the Railway Labor Act or, in the alternative, that issue preclusion prevented the plaintiffs from relitigating the same issues regarding the holiday-season claims that were already decided in arbitration. (ECF No. 91.) The Court lifted the stay in the case on April 1, 2024. (ECF No. 96.)

The complaint was then amended and several new plaintiffs, including Biemer, were added to the case. (ECF No. 104.) Despite the filing of the amended complaint, the Court still ruled on CSX's summary judgment motion because the amended complaint merely added new parties. (ECF No. 105 at 1 n.1.) Further, the amended complaint did not broaden the scope of the allegations, and in their summary judgment briefing, the parties assumed that the new plaintiffs would be added anyway. (*Id.*) On the merits, the Court rejected both of CSX's arguments. As to

11

the second argument, the Court held in relevant part that "the arbitrations had significant procedural limitations that prevented Plaintiffs from fairly presenting their federal statutory claims" and that "the arbitrators did not actually determine the question of whether CSX's stated reasons for discipling the Plaintiffs were pretextual." (*Id.* at 13.)

At that point, many plaintiffs from around the country remained in the case. After receiving briefing on the issue, the Court transferred the cases of almost all non-Maryland plaintiffs to their respective home Districts.[3] (ECF Nos. 128, 129.) On April 4, 2025, the Court permitted the remaining plaintiffs to file a Second Amended Complaint re-alleging the holiday-season claims, in order to simplify and streamline the case. (ECF No. 144.) The Plaintiffs filed the Second Amended Complaint on April 7, 2025. (ECF No. 145.) This is now the operative Complaint. On November 12, 2025, several plaintiffs settled. Biemer, Burgess, and Whisner are the three Plaintiffs remaining. They each bring claims for FMLA retaliation and FMLA interference relating to the 2017/2018 holiday-season disciplinary measures. CSX now moves for summary judgment on these claims.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment on a "claim or defense—or the part of each claim or defense," provided it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the Court will award summary judgment, unless the opposing party can identify

---

[3] For reasons not relevant here, the claims of three non-Maryland plaintiffs remained in this District. (ECF No. 145 ¶ 6.) All three of these plaintiffs have since settled their claims. (ECF No. 172.)

12

specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable factfinder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. Finally, when ruling on a summary judgment motion, the Court must not weigh the evidence or draw credibility determinations. *Id.* at 255.

## III. DISCUSSION

### A. FMLA Retaliation

The FMLA's anti-retaliation provision makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). In other words, an employer may not retaliate against an employee simply because the employee took FMLA leave. *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013).

To make out a claim for retaliation, an employee must prove that their employer intended to retaliate against them. *Shipton v. Balt. Gas & Elec. Co.*, 109 F.4th 701, 706 (4th Cir.), *cert. denied*, 145 S. Ct. 774 (2024). "A plaintiff can demonstrate FMLA retaliation by either (1) producing direct and indirect evidence of retaliatory animus or (2) demonstrating intent by circumstantial evidence, which [the Court] evaluate[s] under the framework established for Title VII cases in *McDonnell Douglas*." *Id.* (internal quotation marks omitted). As the Fourth Circuit explained in *Shipton*:

13

> Under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973), an employee must make [a] prima facie showing that he engaged in protected activity, that the employer took adverse action against him, and that adverse action was [causally] connected to the plaintiff's protected activity. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550–51 (4th Cir. 2006). If the employee demonstrates sufficient evidence to support a prima facie showing of retaliation, and the employer offers a non-discriminatory explanation for the termination, the employee bears the burden of establishing the employer's proffered explanation is pretext for FMLA retaliation. *Id.*

*Shipton*, 109 F.4th at 706. "And to survive summary judgment on pretext, [Plaintiffs] must produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason, *i.e.*, discrimination or retaliation." *Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 793 (4th Cir. 2023) (internal quotation marks omitted). The Court will address each of the *McDonnell Douglas* steps in turn.

### 1. Prima Facie Case

CSX does not dispute that Burgess and Whisner can present a prima facie case of retaliation. (ECF No. 179-1 at 24.) As to Biemer, CSX contends that his claim cannot proceed to trial because he was merely suspended, not terminated. (*Id.* at 38–39.) Thus, the Court understands CSX's argument to be that Biemer has not demonstrated a prima facie case of retaliation because he did not suffer an adverse action. CSX is incorrect. It is undisputed that Biemer was given a suspension, and suspensions of employment are adverse actions in this context. *Laing*, 703 F.3d at 720. However, it is true that there is no evidence in the record indicating that CSX ever terminated Biemer's employment. Consequently, Biemer has presented a prima facie case of retaliation, but his damages would be determined at trial in accordance with the more limited injury that he suffered. But, contrary to CSX's argument, CSX cannot escape

14

*liability* as a matter of law at this stage simply because Biemer may receive less in *damages* at trial.

### 2. Legitimate, Nondiscriminatory Reason

Because each Plaintiff has made out a prima facie case of retaliation, the Court next addresses whether CSX has presented a legitimate, nondiscriminatory reason for the adverse actions. CSX explains that it did not discipline Plaintiffs simply because they took FMLA leave. (ECF No. 179-1 at 25.) Rather, CSX asserts that it disciplined Plaintiffs based on its honest belief that Plaintiffs had violated CSX's workplace policy against dishonesty by misusing FMLA leave. (*Id.* at 25.) Violating corporate policies and misusing FMLA leave constitute legitimate, nondiscriminatory reasons for discipline. *Shipton*, 109 F.4th at 709; *Adkins*, 70 F.4th at 793. But Plaintiffs argue that a mere honest belief that such misconduct has occurred is not sufficient—in the Fourth Circuit, at least—to meet this step of the *McDonnell Douglas* framework. (ECF No. 186 at 12.) While the Fourth Circuit's cases relating to the honest belief doctrine are difficult to parse, the Court concludes that CSX may rest on its honest belief that Plaintiffs committed misconduct to satisfy the second step of the *McDonnell Douglas* framework.

In recent years, the Fourth Circuit has been confronted with the honest belief doctrine three times in the FMLA retaliation context. In two of these cases, the Fourth Circuit stated that it was declining to address the doctrine's applicability to this area. *Shipton*, 109 F.4th at 706; *Sharif*, 841 F.3d at 207 n.2. Yet, in both cases, the Fourth Circuit's actual analysis seemed to accept that an employer's good-faith belief that misconduct had occurred could serve as a legitimate, nondiscriminatory reason for an adverse action. *Shipton*, 109 F.4th at 708 ("In short, the undisputed evidence shows that BGE *believed* Shipton was misusing his FMLA leave." (emphasis added)); *Sharif*, 841 F.3d at 206 (explaining that the employer was not required to further

15

investigate an employee's misconduct because the employer already had "ample reason to *believe* it had been lied to" (emphasis added)). And, in the third case, the Fourth Circuit applied the honest belief doctrine without explicitly saying that it was doing so. *Adkins*, 70 F.4th at 794 ("While we make no determination as to whether the six plaintiffs here *actually engaged* in dishonesty or fraud, . . . we do conclude that the plaintiffs have failed adequately to challenge that suspected dishonesty was CSXT's actual reason for terminating the plaintiffs' employment." (emphasis in original)). Further, district courts in this Circuit commonly apply the honest belief doctrine in the retaliation context. *See, e.g.*, *Fondungalla v. Montgomery Cnty.*, Civ. No. 25-01258-LKG, 2026 WL 787954, at *5 (D. Md. Mar. 20, 2026); *Lands v. City of Raleigh*, Civ. No. 5:21-491-BO, 2024 WL 476869, at *4 (E.D.N.C. Feb. 7, 2024); *Powell v. Biscuitville Inc.*, No. 6:19-CV-80, 2020 WL 7054241, at *4 (W.D. Va. Dec. 2, 2020), *aff'd*, 858 F. App'x 631 (4th Cir. 2021). Thus, the Court is satisfied that CSX has articulated a legitimate, nondiscriminatory reason for disciplining Plaintiffs—its honest belief that Plaintiffs misused FMLA leave in violation of company policy.[4]

### 3. Pretext

The burden now returns to Plaintiffs to establish "at step three of the *McDonnell Douglas* framework that [CSX's] proffered explanation is pretext for FMLA retaliation." *Laing*, 703 F.3d at 721 (internal quotation marks omitted). To carry this final burden, Plaintiffs "must establish both that the employer's reason was false and that retaliation was the real reason for the

---

[4] While Plaintiffs contend that CSX waived application of the honest belief rule, the Court disagrees. Plaintiffs argue that CSX merely applied the honest belief rule to the facts of this case without explaining whether it was good law in the Fourth Circuit in the first place. (ECF No. 186 at 11–12.) And in Plaintiff's view, that was insufficient. But CSX's opening brief fairly raised the honest belief issue (ECF No. 179-1 at 24–25), so CSX did not waive application of the honest belief rule. Plaintiffs had ample opportunity to respond as they saw fit, whether by arguing that CSX wrongly applied the doctrine or by asserting that the doctrine is not good law at all. Thus, there was no unfairness to Plaintiffs nor is the Court issuing an opinion on an unbriefed issue. *See Brown v. Nucor Corp.*, 785 F.3d 895, 918 (4th Cir. 2015).

challenged conduct." *Fry v. Rand Constr. Corp.*, 964 F.3d 239, 246 (4th Cir. 2020) (citation modified) (internal quotation marks omitted). Plaintiffs argue that there are several genuine disputes of material fact which preclude summary judgment on their retaliation claims.

This is a close case. It will be a tall task for Plaintiffs to show at trial that CSX's belief was not honestly held and that CSX instead acted out of retaliatory animus. Plaintiffs' counsel has himself acknowledged that "certainly some of the train crews [were] abusing FMLA" based on the spike in FMLA usage on holidays "that can only be explained, in part, by some FMLA abuse." (ECF No. 186-2 at 12.) But the Court is not prepared to say that no reasonable juror could find in favor of Plaintiffs. At this stage, Plaintiffs have marshaled sufficient evidence for a reasonable juror to find that CSX's stated reason for Plaintiffs' discipline was untrue and that retaliation was the actual reason for Plaintiffs' discipline. To be sure, as Plaintiffs' counsel conceded, there is evidence that leans in CSX's favor as well. But at summary judgment, the Court cannot weigh this evidence or draw credibility determinations. These are the provinces of the jury.

### a. There Is a Genuine Issue of Material Fact as to Whether CSX's Belief that Plaintiffs Misused FMLA Leave Was Honestly Held

Plaintiffs argue that a reasonable juror could conclude that CSX's investigation into Plaintiffs' FMLA use was a sham and that any reliance that CSX placed on this investigation was therefore insincerely held. (ECF No. 186 at 21.) While the current record certainly leaves room for skepticism of these claims, it also contains enough evidence for a reasonable juror to agree with Plaintiffs.

As CSX points out numerous times in its briefing, "courts do not sit as a kind of super-personnel department weighing the prudence of employment decisions." *Shipton*, 109 F.4th at 709 (internal quotation marks and citation omitted). But the FMLA does empower courts to determine

17

if an employer's stated reason for taking an adverse action was the real reason that it did so. As the Fourth Circuit has put it, "[p]retext calls for an inquiry into whether the suspected dishonesty and fraud were the *real reasons* for [CSX's] decision." *Adkins*, 70 F.4th at 793 (emphasis in original). Thus, because CSX's claims rest on its honest belief in Plaintiffs' dishonesty, Plaintiffs must establish a genuine dispute of material fact as to whether CSX's belief was indeed "honestly held." *Smith v. Chrysler Corp.*, 155 F.3d 799, 808 (6th Cir. 1998). Addressing this issue in the Title VII context, the Fourth Circuit described Plaintiffs' task as follows:

> "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held."

*E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 854 (4th Cir. 2001) (quoting *Smith*, 155 F.3d at 807–08). And in the FMLA context, the Fourth Circuit has again relied on the Sixth Circuit's decision in *Smith* and noted that "'the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Sharif*, 841 F.3d at 206 (quoting *Smith*, 155 F.3d at 807); *see also Pack v. CSX Transp., Inc.*, Civ. No. 3:24-0688, 2026 WL 823721, at *6 (S.D.W. Va. Mar. 25, 2026) (concluding that *Smith*'s "analysis aligns with both Supreme Court and Fourth Circuit precedent").

Thus, in determining whether the employer's belief was honestly held, the Court does not sit as a "super-personnel department" or pass on the correctness of the employer's ultimate decision. *See Pack*, 2026 WL 823721, at *4. The Court merely determines whether a rational juror could conclude that the employer's decisional process was not worthy of credence. *Id.* And here, for two primary reasons, a rational juror could find that CSX's decisional process was not

18

worthy of credence and that its reliance on it was therefore not honestly held.

### i.    CSX's Investigative Procedures

First, as the Court has previously determined, "CSX's internal investigative process created a pervasive structural risk of pro-employer bias." (ECF No. 105 at 21.) The updated record before the Court continues to support this finding. Although CSX gave each Plaintiff a pre-discipline hearing, the procedures associated with these hearings were suspect. A CSX manager acted as the hearing officer. (ECF No. 179-33 ¶ 3.) He acted both as judge by conducting the hearing and ruling on objections, and as prosecutor by questioning witnesses. (*See id.*) Further, the company witness dictated the very questions that the hearing officer would then ask her at the hearing. (ECF No. 186-2 at 17.) In other words, the company witness told the hearing's prosecutor (who was also the hearing's judge) precisely which questions the prosecutor should ask the witness. (*See id.*) The employees, meanwhile, were at a significant disadvantage. While employees were accompanied by a union representative, they were not permitted to have legal counsel present nor were there formal rules of evidence that governed the hearings. (ECF No. 182 at 13–15.) The employees and their union representative also did not know in advance what questions would be asked. (ECF Nos. 179-39 at 53–54; 179-40 at 6.)

Despite these procedures, employees occasionally did convince the hearing officer that the charge of dishonesty was not proven. But as in the case of Burgess, for instance, CSX's Labor Relations department could reverse this decision, seemingly without providing any rationale for doing so. (*See* ECF No. 179-51.) The regional superintendent or his designee then accepted Labor Relations' recommendation with no further scrutiny. (ECF No. 179-42 at 15.) And none of this is allayed by the fact that Plaintiffs could appeal CSX's determinations to an arbitrator. As the Court previously explained at length, the arbitration hearings were "inadequate to adjudicate the

19

Plaintiffs' statutory claims." (ECF No. 105 at 21.)

Overall, these facts show that CSX did not merely fail "to comply with established investigatory procedures," which is not "per se sufficient to create a genuine dispute as to pretext." *Sharif*, 841 F.3d at 206. Rather, Plaintiffs have put forth sufficient evidence to suggest that the "established investigatory procedures" were themselves rigged against CSX's employees.

### ii.  Statistical Evidence

Plaintiffs also call into question the statistical evidence that CSX's investigation relied on. In doing so, Plaintiffs rely heavily on *Parker v. CSX Transportation, Inc.*, Civ. No. 2:18-00274-MHH, 2021 WL 3022703 (N.D. Ala. July 16, 2021), a case which also addressed CSX's mass firing of employees for alleged misuse of FMLA leave during the holiday season of 2017 and 2018. In *Parker*, Judge Haikala pointed to the serious flaws in the 4-in-10 holidays test that CSX utilized to determine which employees should be disciplined. *Id.* at *14–16. For instance, she found the test to be "problematic" because "it targets employees who may have the greatest need for FMLA leave by investigating only employees who used FMLA leave on at least four of the preceding ten holidays." *Id.* at *15. Judge Haikala also concluded that the test was both under- and over-inclusive:

> A CSX employee could lie about the need for FMLA leave on December 25, 2017 and December 31, 2017 and face no investigation if she had not used FMLA leave on other holidays and special occasions. Another employee could legitimately use FMLA leave for every holiday and special occasion between January 1, 2017 and December 31, 2017 and be removed from service based on the 4-in-10 presumption that the employee was dishonest, punishing that employee for a substantial need for leave.

*Id.* And most importantly, the test's methodology was completely divorced from context. That is because the test examined only holiday FMLA use; inexplicably, it did not consider non-holiday

20

FMLA use at all. As Judge Haikala explained:

> [I]f an employee used FMLA leave for ten days in a 12-month period, and five of those days were holidays, an employer might have reason to suspect misuse of leave. If an employee used FMLA leave for 60 days in a 12-month period and five of those days were holidays, there would be much less reason to pursue an investigation. CSX focused on employees' use of FMLA leave on holidays without considering context.

*Id.*

The Court agrees with each of these aspects of Judge Haikala's analysis. Her discussion of statistical context is particularly compelling. As the Fourth Circuit has emphasized, "[t]he usefulness of statistics depends on the surrounding facts and circumstances." *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994). Here, as Judge Haikala explained, the most critical background information to ascertain was whether employees used FMLA leave uniquely more on holidays *compared to non-holidays*. As Whisner himself testified at his hearing, "I mark off whenever I'm needed. My mother has no recollection on whether it's a holiday that she needs being taken care of, or if it's a Tuesday." (ECF No. 179-52 at 15.) Nonetheless, at the investigatory hearings, CSX presented evidence only about Plaintiffs' FMLA usage on holidays or days adjacent to rest days or weekends. (ECF Nos. 179-20, 179-21, 179-23.) CSX did not consider broader FMLA usage at all in making its disciplinary decisions. Even now, despite attaching over 60 exhibits to its Motion, CSX has still not put any evidence in the record—as far as the Court can discern—that recounts all of the dates that Plaintiffs used their FMLA leave. And, given the limited evidence that is currently in the record related to this subject, a reasonable juror could conclude that this omission of broader context was not accidental. Burgess and Whisner each took over four weeks of total FMLA leave, which suggests that a substantial majority of that leave was not on holidays. (ECF Nos. 179-49 at 9; 179-53 at 8.) While Biemer took less total FMLA leave (ECF No. 179-45

21

at 5), that does not change the fact that CSX still did not consider any broader context when disciplining him.

The upshot is that at Plaintiffs' investigatory hearings, and now before this Court, CSX has highlighted only the most incriminating use of FMLA leave while actively ignoring non-incriminating use. CSX responds that this broader context is irrelevant because Plaintiffs could have both misused FMLA leave on holidays and used it properly on non-holidays. (ECF No. 189 at 12.) While possible, this is a factual dispute that cannot be resolved at the summary judgment stage. That is because, as the Court has explained, a reasonable juror could find that CSX's use of statistics was fatally flawed and that CSX's resulting decisions based on the statistical test were therefore not reasonably informed or considered. As discussed above, a reasonable juror could also find that CSX's reliance on its investigatory procedures was insincere. Ultimately, considering this evidence altogether, there is a genuine issue of material fact as to whether CSX's "decisional process [was] 'unworthy of credence,'" such that "any reliance placed by the employer in such a process cannot be said to be honestly held." *Sears Roebuck*, 243 F.3d at 854.[5]

### b. There Is a Genuine Issue of Material Fact as to Whether Retaliation Was the Real Reason for Plaintiffs' Discipline

Because the Court concludes that a reasonable juror could find that CSX's belief that Plaintiffs misused FMLA leave was not honestly held, the Court has no trouble concluding that a reasonable juror could further determine that retaliation was the real reason for Plaintiffs'

---

[5] Despite this, the Court rejects Plaintiffs' argument that there is comparator evidence which also establishes pretext. Plaintiffs argue there is pretext because CSX did not discipline every employee who was flagged by the screening algorithm. (ECF No. 186 at 20.) Rather, CSX wholesale excluded from discipline any employee who was in late-stage pregnancy or suffering from cancer or a terminal illness. (*Id.*) However, a "plaintiff cannot establish a claim of disparate treatment by referencing a comparator of the same protected class." *Spiller-Holtzman v. Univ. of Md., Balt.*, 805 F. Supp. 3d 602, 618 (D. Md. Sept. 16, 2025) (citation omitted). Rather, in this context, a proper comparator would be "an employee accused of violating the same company policy [as Plaintiffs] but who did not take FMLA leave." *Laing*, 703 F.3d at 721. Plaintiffs provide no such comparators. Thus,. Plaintiffs have not established a genuine dispute as to pretext via comparator evidence.

22

discipline. *See Fry*, 964 F.3d at 246. "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). Thus, in some cases, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. Here, though, Plaintiffs have not rested on their prima facie case and the evidence rebutting CSX's justification. Rather, Plaintiffs have affirmatively presented evidence such that a reasonable juror could find that retaliation was the real reason for their discipline.

The Court finds two pieces of evidence to be most salient. First, CSX's screening algorithm for holiday misuse was much stricter than the original screening algorithm it used. While that initial algorithm was also problematic (*see, e.g.*, ECF No. 179-39 at 18), CSX at least notified its employees when they were flagged and gave them several chances to correct course (*id.* at 27). But the holiday misuse algorithm captured employees, such as all three Plaintiffs, who had little to no evidence of prior FMLA misuse. Indeed, Biemer had never been warned about misuse (ECF No. 179-47) and Burgess and Whisner had each only been warned once (ECF Nos. 179-48 at 25; 179-52 at 7). And after they were flagged, none of the employees were given the chance to change their FMLA usage. Rather, they were all immediately suspended pending a hearing. (ECF No. 179-19 ¶ 3.)

Second, a reasonable juror could conclude that the hearings were merely a cover that served to discourage legitimate FMLA use. Despite what CSX claims, these hearings did not include individualized reviews. The only "individualized" aspect of the review was that the charging officer presented evidence showing the specific holidays that Plaintiffs had used FMLA leave.

23

Unlike prior cases of FMLA misuse, CSX did not surveil Plaintiffs with private investigators or admit evidence from Plaintiffs' social media profiles that indicated what Plaintiffs may have been doing on the holidays. (ECF Nos. 179-39 at 54; 186-2 at 21.) And, critically, CSX did not consider why each Plaintiff may have used their FMLA leave time over the holidays. After all, Biemer and Whisner were approved for FMLA leave specifically to care for their parents. (ECF Nos. 179-3 at 7; 179-13 at 5.) As Plaintiffs point out in their briefing, holidays are a time of acute need for caretaking. And even if Burgess' stated reason for taking leave over holidays—flare-ups of his IBS—may have been less credible, it does not ultimately matter now because it did not matter to CSX in 2018. The question is not whether Plaintiffs, in fact, used FMLA leave legitimately but whether CSX's discipline of Plaintiffs was meant to stop them from taking FMLA leave legitimately. Given the manner in which CSX used the holiday use screening algorithm and the lack of individualized inquiries, Plaintiffs have shown that there is a genuine issue of material fact as to whether retaliation for the use of FMLA leave was the real reason for Plaintiffs' discipline. *See Pack*, 2026 WL 823721, at *7 (quoting *Parker*, 2021 WL 3022703, at *16 ("The reverberating message CSX sent to employees with its arbitrary test is clear: use FMLA leave over the holidays, and you may be taken out of service to face charges of misuse.")) Accordingly, the Court will deny summary judgment on Plaintiffs' FMLA retaliation claim.

### B. FMLA Interference

The Court will, however, grant summary judgment in favor of CSX on Plaintiffs' claim for FMLA interference. Under the FMLA's anti-interference provision, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). The parties agree, however, that in a case such as this one, the analyses of FMLA interference and retaliation claims merge. (ECF Nos.

24

179-1 at 39–40; 186 at 22.) That is because Plaintiffs' "interference theory is not that [they were] prohibited from taking . . . leave, only that [they were] disciplined for doing so. Consequently, [their] FMLA claims for retaliation and interference effectively merge into one claim, which sounds in retaliation, not interference." *Mussat-Whitlow v. Winston-Salem State Univ.*, Civ. No. 1:25- 00263, 2026 WL 674180, at \*6 n.6 (M.D.N.C. Mar. 10, 2026). Accordingly, Plaintiffs' only path to relief is via the FMLA's anti-retaliation provision, so the Court will enter judgment in favor of CSX on the FMLA interference claim. *See Brown*, 2026 WL 178735, at \*10; *Pack*, 2026 WL 105022, at \*3.

## IV. CONCLUSION

For the foregoing reasons, Defendant CSX Transportation, Inc.'s Motion for Summary Judgment (ECF No. 179) will be granted in part and denied in part. A separate Order follows.

DATED this __2__ day of July, 2026.

BY THE COURT:

James K. Bredar
United States District Judge

25